**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| ZPOWER TEXAS, LLC, AND | § | |
| ZPOWER, LLC, | § | CASE NO. 20-41157-11 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

---

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS'**
**JOINT PLAN OF LIQUIDATION**

---

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

**ATTORNEYS FOR THE DEBTORS-IN-POSSESSION**

**DATED: JANUARY 21, 2021.**

## <u>INTRODUCTORY DISCLOSURES</u>

THIS DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' JOINT PLAN OF LIQUIDATION (THE "<u>DISCLOSURE STATEMENT</u>"), FILED BY THE DEBTORS (DEFINED BELOW), SUMMARIZES CERTAIN PROVISIONS OF THE DEBTORS' JOINT PLAN OF LIQUIDATION (THE "<u>PLAN</u>"), INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST THE DEBTORS. THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTORS AND THE CLAIMS ASSERTED AGAINST THE DEBTORS IN THE BANKRUPTCY CASE. WHILE THE DEBTORS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE INFORMATION SUMMARIZED, CREDITORS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL BEFORE CASTING THEIR BALLOTS.

EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DEBTORS' ASSETS AND LIABILITIES, THE PAST OR FUTURE OPERATION OF THE DEBTORS, THE PLAN, OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN, OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, ARE UNAUTHORIZED AND SHOULD BE REPORTED TO THE DEBTORS.

THE APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT

OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED AS CONFERRING UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER. THE DISCLOSURE STATEMENT IS INFORMATIONAL ONLY. ADDITIONALLY, CREDITORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH CREDITOR SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY MATTER CONCERNING THE PLAN, INCLUDING THE TREATMENT OF CLAIMS UNDER THE PLAN, THE RELEASES PROVIDED BY AND PROPOSED UNDER THE PLAN, THE TRANSACTIONS AND INJUNCTIONS PROVIDED UNDER THE PLAN, AND THE VOTING PROCEDURES AND ELECTIONS APPLICABLE TO THE PLAN.

**THE PLAN CONTAINS STRONG INJUNCTIONS THAT MAY PERMANENTLY AFFECT AND LIMIT YOUR RIGHTS. READ THIS DISCLOSURE STATEMENT AND PLAN CAREFULLY**

## DEFINITIONS

In addition to the defined terms listed above and defined elsewhere in this Disclosure Statement, the following terms, as used in this Disclosure Statement, shall have the following meanings, and such meanings shall be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires. Further, terms that are used in this Disclosure Statement, which are defined in the Plan, shall have the meaning ascribed to them in the Plan.

"**Administrative Claim**" means a Claim for any cost or expense of administration of the Bankruptcy Case under section 503(b) of the Bankruptcy Code, including, without limitation, any fees or charges assessed against the Estate pursuant to 28 U.S.C. § 1930, and further including a Professional Claim, but excludes the Riot Energy Postpetition Debt. For the avoidance of doubt, Administrative Claims do not include Secured Tax Claims.

"**Administrative Claims Bar Date**" means the day that is thirty (30) days after the Effective Date.

"**Administrative Tax Claim**" means any *ad valorem* tax claim assessed against, or payable by, the Debtors or the Estates or their property for or on account of a period after the Petition Date, specifically excluding Secured Tax Claims.

"**Allowed**" as it relates to any type of Claim provided for under the Plan, but excluding a Professional Claim, means a Claim:

(i)      which has been scheduled as undisputed, noncontingent and liquidated in the Schedules in an amount other than zero or unknown, and as to which:
         a.   no proof of Claim has been timely filed; and
         b.   no objection has been timely filed (as determined by applicable deadlines contained in the Plan, including the Claims Objection Deadline);

(ii)      as to which a proof of Claim has been timely filed and either:
         a.   no objection thereto has been timely filed (as determined by applicable deadlines contained in the Plan, including the Claims Objection Deadline); or
         b.   such Claim has been allowed (but only to the extent allowed) by a Final Order of the Bankruptcy Court;

(iii)      which has been expressly allowed under the provisions of the Plan; or

(iv)      which has been expressly allowed by Final Order of the Bankruptcy Court.

"**Allowed Administrative Claim**" means: (i) an Administrative Claim that has been Allowed (but only to the extent Allowed), if approval from the Bankruptcy Court is required in order to Allow the same; or (ii) an Administrative Claim which: (a) is incurred by the Debtors after the Petition Date in the ordinary course of business operations or pursuant to an order entered by the Bankruptcy Court granting automatic

Administrative Claim status; (b) is not disputed by the Debtors; and (c) does not require approval from the Bankruptcy Court to become Allowed.

"**Allowed Priority Claim**" means a Priority Claim that has been Allowed (but only to the extent Allowed).

"**Allowed Secured Claim**" means a Secured Claim that has been Allowed (but only to the extent Allowed).

"**Allowed Unsecured Claim**" means an Unsecured Claim that has been Allowed (but only to the extent Allowed).

"**Avoidance Actions**" means any and all rights, claims or actions which the Debtor may assert on behalf of the Estate under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of sections 328, 542, 544, 545, 546, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code.

"**Bankruptcy Case**" means jointly administered Bankruptcy Case No. 20-41157 in the Bankruptcy Court.

"**Bankruptcy Code**" means 11 U.S.C. §§ 101, *et. seq.*, in effect as of the Petition Date and as may have been or may be amended or supplemented since, to the extent that any such amendment or supplement is automatically applicable to the Bankruptcy Case by operation of law and not by operation of any election or choice.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division or, if such court ceases to exercise jurisdiction, the court or adjunct thereof that exercises jurisdiction over the Bankruptcy Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, together with the local bankruptcy rules for the Bankruptcy Court as now in effect or as the same may from time to time hereafter be amended.

"**Bar Date**" means August 13, 2020 for claims of persons other than Governmental Units, and 180 days after the Petition Date for claims of Governmental Units pursuant to Bankruptcy Rule 3002(c)(1).

"**Business Assets**" means all property and assets of the Debtors and the Estates, save and except for: (i) the Creditor Trust Assets; and (ii) Executory Contracts assumed by the Debtors prior to the Confirmation Hearing or under the Plan. For the avoidance of doubt, Business Assets includes all cash (except the Seed Money), accounts, accounts receivables, contract rights, general intangibles, patents, trademarks, inventory, work-in-process, finished goods, machinery, equipment, furniture, fixtures, tax rebates, intellectual property, copyrights, books and records, manuals, rights to employees, the Oticon Actions, breach of contract claims and causes of action arising after the Petition Date, and all other personal property of the Debtors and the Estates.

"**Business Day**" means any day which is not a Saturday, a Sunday, or a "legal holiday" within the meaning of Bankruptcy Rule 9006(a).

"**Causes of Action**" means any claim or cause of action of the Debtors or the Estates against any person, including on account of receivables, malpractice or professional negligence, theft, misappropriation, breach of fiduciary duty, overpayment, restitution, and any other claim or cause of action, including the Widex Actions, the D&O Actions, the D&O Insurance and the Avoidance Actions, but expressly excluding: (i) breach of contract or receivables arising after the Petition Date (except as to the Widex Actions) and (ii) any claim or cause of action against the Riot Energy Releasees.

"**Claim**" means a claim against one or more of the Debtors, the Estates, and/or property of the Debtors or the Estates, as such term is otherwise defined in section 101(5) of the Bankruptcy Code, and arising at any time prior to the Effective Date, including first arising after the Petition Date, regardless of whether the same would otherwise be a claim under said section 101(5) of the Bankruptcy Code.

"**Claims Objection Deadline**" means the date by which parties authorized by the Plan may file any objection to a Claim, which date shall be one-hundred and eighty (180) days after the Effective Date, except with respect to Administrative Claims as otherwise provided for herein and with respect to Disputed Claims.

"**Class**" means one of the categories of Claims and Equity Interests established under Article II of the Plan.

"**Confirmation Date**" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

"**Confirmation Hearing**" means the hearing(s) before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing(s) may be continued, rescheduled or delayed.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, modified, or supplemented.

"**Creditor**" means the holder of any Claim entitled to distributions under the Plan with respect to such Claim.

"**Creditor Trust**" has the meaning assigned to it in section 5.3.1 of the Plan.

"**Creditor Trust Assets**" has the meaning assigned to it in section 5.3.4 of the Plan.

"**Creditor Trust Trustee**" has the meaning assigned to it in section 5.3.2 of the Plan.

"**Cure Claim**" means a Claim required to be paid under section 365 of the Bankruptcy Code in order to assume any Executory Contract, including, as may be applicable, any nonmonetary portion thereof.

"**D&O Actions**" means any and all claims and causes of action of the Debtors and the Estates, except and only to the extent otherwise expressly and specifically released in the Plan, for breach of fiduciary duty or breach of any other duty or contract against any past

or present officer of the Debtors or member of any of the Debtors' boards of managers, or advisor to the same, or other fiduciary of the Debtors, including any claim for any damages, punitive damages, sanctions, and fees related to or resulting from the same, and further including any and all rights to any insurance policies and proceeds regarding the same and all insurance demands and related rights under all applicable law related to the same.

"**D&O Insurance Actions**" means any and all claims and causes of the Debtors and the Estates against any insurance company or carrier related to any prior, present, or future denial of coverage with respect to any aspects of the D&O Claims, including all rights under all applicable law with respect to the same, including for bad faith or improper denial of coverage, breach of contract, treble or other damages, fees, and all consumer or insured protection statutes.

"**Debtors**" mean ZPower, LLC and ZPower Texas, LLC.

"**Debtor Releasees**" means the Debtors and their members, shareholders, their current and former officers, directors, agents, employees, attorneys, other professionals, representatives, predecessors, successors and assigns, (including current and former officers and directors and pre-petition agents, attorneys and other professionals**).**

"**DIP Lender**" means Riot Energy, Inc. formerly known as Z Battery DIP Lenders, LLC.

"**DIP Order**" means that certain *Interim Order (I) Authorizing Post-Petition Secured Financing Pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 503(b) of the Bankruptcy Code; (II) Scheduling a Final Hearing* [Bankruptcy Case Docket No. 36] and any stipulation or order entered in the Bankruptcy Case extending such order.

"**Disallowed Claim**" means, as it relates to any type of Claim provided for under the Plan, except an Administrative Claim (or a Professional Claim), a Claim or portion thereof that:

(i)     has been disallowed by a Final Order of the Bankruptcy Court;

(ii)    is identified in the Schedules in an amount of zero dollars, unknown dollars, or as contingent, unliquidated, and/or disputed, and as to which a proof of Claim was not filed by the Bar Date; or

(iii)   is not identified in the Schedules and as to which no proof of Claim has been filed or deemed filed by the Bar Date, if the filing of such proof of Claim is otherwise required.

"**Disclosure Statement**" means the Disclosure Statement with respect to the Plan, approved by the Bankruptcy Court as containing adequate information for the purpose of dissemination and solicitation of votes on confirmation of the Plan, either in its present form or as it may be altered, amended or modified from time to time.

"**Effective Date**" means the first Business Day fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) days after the Confirmation Date, and upon which the conditions to the effectiveness of the Plan set forth in Article IX hereof are satisfied.

"**Equity Interests**" means all stock or other securities evidencing any ownership of any equity interest of the Debtors.

"**Estates**" means the estates created for the Debtors pursuant to section 541 of the Bankruptcy Code and any other applicable provision thereof.

"**Executory Contract**" means, collectively, "executory contracts" and "unexpired leases" of the Debtor as of the Petition Date as such terms are used within section 365 of the Bankruptcy Code.

"**Final Decree**" means the final decree entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

"**Final Order**" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which:

(i)     the time to appeal or petition for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or

(ii)    any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

"**Governmental Unit**" means a governmental unit as such term is defined in section 101(27) of the Bankruptcy Code.

"**MidCap**" means MidCap Financial Trust.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, unincorporated organizations, or other legal entities, irrespective of whether they are governments, agencies or political subdivisions thereof.

"**Petition Date**" means March 17, 2020.

"**Plan**" means the *Debtors' Joint Plan of Liquidation*, either in its present form or as it may be altered, amended or modified from time to time.

"**Priority Claim**" means any Claim entitled to priority in payment under section 507(a) of the Bankruptcy Code, excluding any Claim that is an Administrative Claim or that is a Secured Tax Claim.

**"Pro Rata"** means proportionally based on one's portion of the whole, and not per capita.

**"Professional"** means any Person employed or to be compensated pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

**"Professional Claim"** means a Claim by a Professional for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court.

**"Purchase Price Amount"** means $4,300,000.00 of the Riot Energy Debt, including all the Riot Energy Postpetition Debt.

**"Rejection Damages Claim"** means the Claim in favor of a counterparty to an Executory Contract that is rejected by the Debtors, but that is not an Administrative Claim.

**"Rejection Damages Claim Bar Date"** means the day that is thirty (30) days after the Effective Date, if the Executory Contract giving rise to the Rejection Damages Claim is rejected under the Plan.

**"Riot Energy"** means Riot Energy, Inc. formerly known as Z Battery DIP Lenders, LLC.

**"Riot Energy APA"** means the Asset Purchase Agreement between the Debtors as Sellers and Riot Energy, Inc. f/k/a Z Battery DIP Lenders, LLC as Purchaser pursuant to which Riot Energy will acquire the Business Assets of the Debtors in exchange for certain of the Riot Debt.

**"Riot Energy Claims"** means all Claims arising from the Riot Energy Debt.

**"Riot Energy Debt"** means the Riot Energy Postpetition Debt and the Riot Energy Prepetition Secured Debt.

**"Riot Energy Postpetition Debt"** means all principal, interest and other amounts owed by the Debtors pursuant to the DIP Order. For the avoidance of doubt, "Riot Energy Postpetition Debt" includes all claims and rights to a superpriority Administrative Claim and to replacement liens and diminution liens.

**"Riot Energy Prepetition Secured Debt"** means (i) all principal, interest, fees and other amounts owed by the Debtors to Riot Energy, arising under the Senior Secured Credit Agreement, (ii) any amounts owed to or Claims held by Riot Energy arising under any order entered in the Bankruptcy Case relating to the Senior Secured Credit Agreement and (iii) all principal, interest, fees and other amounts owed by the Debtors to Riot Energy arising under the Promissory Note and Security Agreement, dated March 16, 2020, between ZPower Texas, LLC ("Maker") and Riot Energy ("Payee");.

**"Riot Energy Released Amount"** means all of the Riot Energy Debt, save and except for the Purchase Price Amount.

"**Riot Energy Releasees**" means Riot Energy, its members, shareholders, its current and former officers, directors, agents, employees, attorneys, other professionals, representatives, predecessors, successors and assigns, (including current and former officers and directors and pre-petition agents, attorneys and other professionals**).**

"**Schedules**" means the Schedules of Assets and Liabilities and the Statements of Financial Affairs filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

"**Secured Claim**" means a Claim that is alleged to be secured, in whole or in part, (i) by a lien against an asset of the Debtors or the Estates; or (ii) as a result of rights of setoff under section 553 of the Bankruptcy Code.

"**Secured Tax Claim**" means a Claim of a Governmental Unit for the payment of *ad valorem* real property and business personal property taxes that is secured by property of the Debtors or the Estates arising prior to the Petition Date.

"**Senior Secured Credit Agreement**" means the Amended and Restated Credit and Security Agreement, dated as of July 15, 2019, as amended by that certain First Amendment to Amended and Restated Credit and Security Agreement, dated as of October 3, 2019, among ZPower, LLC, as Borrower, MidCap, as a Lender and as Agent, and the other lenders from time to time party thereto (as the same may have been and may be further amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement"), and all promissory notes, loan documents, collateral instruments, UCC financing agreements, pledge agreements, and all other contracts, agreements, documents, and instruments referenced in, evidencing or in any way related to the Credit Agreement.

"**Subordinated Claims**" means all Claims that are subordinated under section 510 of the Bankruptcy Code, or voluntarily in the Plan, or otherwise voluntarily through a document filed in the Bankruptcy Case.

"**Substantial Consummation**" means the date on which any of the following first happens: (i) the Plan Funding is made; or (ii) the Bankruptcy Court otherwise finds that substantial consummation within the meaning and operation of the Bankruptcy Code has occurred.

"**Unsecured Claim**" means any alleged Claim against the Debtor that is not secured by (or to the extent not secured by) a valid, enforceable, and unavoidable lien against any asset of the Debtor or the Estate, including any deficiency claim, which does not enjoy any administrative or priority status under the Bankruptcy Code.

"**Voting Deadline**" means the period established by the Bankruptcy Court within which Ballots may be cast on the Plan.

"**Widex Actions**" means any and all claims and causes of action of the Debtors and the Estates against Widex, a Danish Company, and against Widex USA, Inc., and against any

affiliate of any of the foregoing, existing as of the Petition Date or arising thereafter, including for unpaid accounts receivable, for breach of contract, for anticipatory breach or repudiation of contract, for violations of the automatic stay, and for contempt of court, including for all damages, punitive damages, sanctions, and fees assertible against or in connection with the same, including as asserted by the Debtors in Adversary Proceeding No. 20-04026 pending in the Bankruptcy Court.

**"ZPower"** means ZPower, LLC, a Delaware limited liability company and the Debtor in Case No. 20-41158-11.

**"ZPower Texas"** means ZPower Texas, LLC, a Texas limited liability company, wholly owned subsidiary of ZPower, and the Debtor in Case No. 20-41157-11.

## DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS'
## JOINT PLAN OF LIQUIDATION

The Debtors hereby submit this Disclosure Statement (the "<u>Disclosure Statement</u>") in support of the *Debtors' Joint Plan of Liquidation*, a copy of which is attached hereto as **Exhibit "A"**.

## ARTICLE I.
## INTRODUCTION

On March 17, 2020, the Debtors filed their petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, thereby initiating their bankruptcy cases. On March 23, 2020, the Bankruptcy Court ordered that the Debtors' bankruptcy cases would be jointly administered, under Case No. 20-41157, for procedural purposes, without the Debtors' respective Estates being substantively consolidated.

On January ___, 2021, the Debtors filed the Plan with the Bankruptcy Court. The Plan proposes, among other things, the means by which all Claims against the Debtors will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code. The Plan is essentially a new contract between the Debtors and their Creditors, proposed by the Debtors to Creditors for approval. Creditors approve or disapprove of the Plan by voting their Ballots on the Plan, if they are in a Class entitled to vote, and, if appropriate, by objecting to confirmation of the Plan. Still, the Plan can be confirmed by the Bankruptcy Court even if less than all Creditors or Classes accept the Plan and, in such an instance, the Plan will still be binding on those Creditors or Classes that rejected the Plan. Approval and consummation of the Plan will allow for the conclusion of the Bankruptcy Case.

The Debtors hereby submit this Disclosure Statement in connection with the solicitation of votes on, and providing information regarding, the Plan. On _____, 2021, after notice and a hearing, the Bankruptcy Court, the Honorable Edward Lee Morris presiding, approved the Disclosure Statement as containing information of a kind and in sufficient detail, to enable Creditors whose votes on the Plan are being solicited to make an informed judgment on whether to accept or reject the Plan. The Bankruptcy Court's approval of the Disclosure Statement does not constitute the Bankruptcy Court's approval or disapproval of the Plan.

This Disclosure Statement, which includes the Plan as Exhibit "A", is being mailed to each holder of a Claim (or potential Claim) against the Debtors that has not been disallowed, together with various other parties-in-interest who, even if not Creditors, may be affected by the Plan and may have the right to object to the Plan. But the Debtors are seeking votes on the Plan only from Classes who are entitled to vote. Only those parties who have received a Ballot may vote to accept or reject the Plan. All Creditors and parties-in-interest may object to the confirmation of the Plan, even if they do not necessarily vote on the Plan.

With respect to voting on the Plan, pursuant to the Bankruptcy Code, only those Creditors within impaired Classes under the Plan are entitled to vote. The purpose of this Disclosure Statement is to enable such Creditors to make an informed decision in exercising their right to vote to accept or reject the Plan.

The Debtors have promulgated the Plan consistent with the provisions of the Bankruptcy Code. The Debtors believe that the Plan provides the best means for maximizing recovery to each of the Classes under the Plan, in the most expedient manner, and in light of the assets available for distribution to Creditors. The Debtors believe that the Plan enables affected Creditors to receive a distribution on account of their Claims that is substantially greater than what they would receive if the Bankruptcy Case were converted to a Chapter 7 liquidation and assets of the Debtors were liquidated within the parameters of Chapter 7 of the Bankruptcy Code.

This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid and supplement to your review of the Plan and attempts to explain the terms and implications of the Plan. Every effort has been made to fully explain the various aspects of the Plan. All Persons receiving this Disclosure Statement are urged to review all of the provisions of the Plan, which is attached to this Disclosure Statement as Exhibit "A," in addition to reviewing the text of this Disclosure Statement. If you have any questions, you may contact the Debtors' counsel and every effort will be made to assist you. Please note, however, that the Debtors' counsel will not provide you with any legal advice, and you are encouraged to seek the advice of separate legal counsel regarding the Plan, and your rights thereunder.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtors, their operations, and their assets and liabilities, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Still, you are entitled to rely on your own information, analyses, and opinions even if that information is not contained in this Disclosure Statement.

After carefully reviewing this Disclosure Statement and the Plan, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot (if you have been provided with one) and returning the same to the address set forth on the Ballot, in the enclosed return envelope, so that it will be received by the Balloting Agent no later than 5:00 p.m., Central Time, on _____, 2021:

Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
3800 Ross Tower
500 N. Akard St.
Dallas, TX 75201
Facsimile: (214) 978-5359

If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim, you may be bound by the Plan if it is accepted by the requisite holders of Claims. See Article IV of this Disclosure Statement for a discussion of voting procedures and requirements.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M., CENTRAL TIME, ON** _____
For detailed voting instructions and the name and address of the person you may contact if you have questions, see Article IV of this Disclosure Statement.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on _____, 2021, at _____.m., Central Time, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____, 2021, at 5:00 p.m., in the manner described in Article V.B of this Disclosure Statement.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

## ARTICLE II.
## OVERVIEW OF THE PLAN

Parties are cautioned to read the Plan carefully in order to fully understand its terms. This section offers a summary of the Plan only, given in lay and non-technical terms, and is not to be construed as conclusive.

To put it bluntly, the Debtors and the Estates do not have sufficient assets to provide large recoveries to affected Creditors, and the value of equity interests in the Debtors is zero, and likely has been for a long time. While the Debtor's business grew in the years prior to the Bankruptcy Case, its historical debt loads and its byzantine equity and capital structure—which may otherwise have been fine with a highly successful startup—made it all but impossible for the Debtor to cash flow or be a profitable company even though the Debtor was able to make an operational profit. Moreover, the Debtor's high-growth model led the Debtor to price its products to its largest customers almost on a "loss leader" basis, meaning that, despite large sales, the Debtor lost money on every battery it manufactured and sold.

The situation only grew worse prior to and after the Bankruptcy Case. MidCap, the Debtor's prepetition secured lender, declared a default on its debt in early March, 2020, and swept more than $1 million in cash that the Debtor was holding, and then swept future receivables as they came in. MidCap refused to tell the Debtor what the factual alleged basis for the default was, and the Debtor was forced to file Chapter 11 in order to preserve its business and obtain financing from Riot Energy. Shortly after the Bankruptcy Case was filed, the Debtor's largest customer, Widex, cancelled all orders, terminated the Debtor's products from its hearing aids, and, through a blast e-mail, informed the market of this and that the Debtor was liquidating. These untrue statements caused serious damage by way of a large loss of revenue and market share, which the Debtor continues to struggle from. Additional problems continued postpetition, as the Debtor struggled to obtain other orders from other customers to operationally cash-flow. This, plus ongoing negotiations with the Debtor's landlord, left the Debtor with long period of uncertainty as to what options, if any, the Debtor had. Also, as a result of having filed Chapter 11, the Debtor was not eligible for a PPP loan.

All the while, the market for the Debtor's current products will continue to decline. This is natural, as battery technologies and needs change, and what was once a popular battery will, over time, no longer be viable in the market. Thus, within the next few years, the Debtor's sales of current products will likely decline to a negligible amount. The only real upside for the Debtor in the future is its large portfolio of patents and proprietary knowledge and knowhow, as well as extensive research and development, concerning the next generation of flexible, printable

batteries. While the Debtor has so far been successful with these efforts and believes itself to be at the forefront of the new battery technology, producing a market-ready flexible, printable battery still needs millions of dollars of additional research and development, licensing, and marketing funds, which the Debtor does not have.

Moreover, through extensive communications with key constituents, it became clear that no large creditor or equity interest holder (other than the individuals affiliated with Riot Energy) were prepared to participate in a rights offering, through which they could purchase interests in a reorganized debtor in exchange for new money and some of their old interests. This meant that the Debtor did not have a source of capital from which it could reorganize and fund future research and development.

In the end, the only viable solution is a liquidation of the Debtors. In order to accomplish this objective, the Plan contains two significant components.

First, under the Plan, Riot Energy will acquire all the Debtors' Business Assets in exchange for a credit bid of $4,300,000.00. The Plan provides that Riot Energy has an allowed claim of $21,187,503.00. Riot Energy will be responsible for paying all Administrative Claims, Priority Claims, and Secured Tax Claims. Thereafter, Riot Energy will fund, monetize, or otherwise use the Business Assets as it sees fit, at its sole cost and burden, and for its sole potential benefit and profit.

Second, a liquidating trust is created under the Plan for the benefit of General Unsecured Creditors. On the Effective Date of the Plan, the following assets will be transferred to the Creditor Trust: (a) all Causes of Action, including (i) the Widex Actions; (ii) the D&O Actions, (iii) the Avoidance Actions, and (iv) the D&O Insurance Actions; and (b) $50,000.00 in cash from the Debtors that is otherwise Riot Energy's cash collateral. A trustee will be appointed to liquidate these assets and distribute the proceeds to General Unsecured Creditors on a pro rata basis. General Unsecured Creditors will therefore have the benefit of everything of value that they have today, plus additional cash and consideration, and without more than $20 million of Riot Energy debt to share that value with.

On the Effective Date, all equity interests in the Debtors will be canceled. The Debtors will then undertake the process of winding down under applicable state law, and they will thereafter cease to exist.

The Plan protects all Creditors by ensuring that the Plan will not become effective, and therefore binding, unless all conditions precedent and contingencies in the Plan are satisfied. These conditions precedent and contingencies include the Bankruptcy Court entering an order confirming the Plan, only after appropriate notice and a hearing.

There are alternatives to the Plan, as discussed in this Disclosure Statement. The Debtors believe that each of these alternatives is worse for most Creditors—much worse for many Creditors, like Priority Creditors (consisting mostly of employee claims) would likely not be paid at all. The Debtors urge all Creditors to read this Disclosure Statement, to review the Plan, and to consider alternatives to the Plan and, having done so, to vote to accept the Plan.

## ARTICLE III.
## SUMMARY OF TREATMENT UNDER THE PLAN

**A.** **CLASSES AND DISTRIBUTIONS**

The Plan separates Claims and Equity Interests against the Debtors, the Estate, and their property into unclassified Claims and classified Claims. Creditors vote on the Plan by their respective Class.

Unclassified Claims are generally postpetition Claims which must be paid in full and which do not vote on the Plan, and consist of Administrative Claims, including Professional Claims, and Administrative Tax Claims.

Classified Claims and Equity Interests are classified in the Plan under the provisions of section 1122 of the Bankruptcy Code into following separate Classes:

| | |
|---|---|
| Class 1: | Priority Claims |
| Class 2: | Secured Tax Claims |
| Class 3: | Riot Energy Claims |
| Class 4: | Unsecured Claims |
| Class 5: | Subordinated Claims |
| Class 6: | Equity Interests |

The chart below graphically demonstrates the classification and treatment of classified and unclassified Claims under the Plan. In preparing and submitting this chart, the Debtors make clear the following considerations:

- The chart is an estimate only, based on reasonable assumptions, but as an estimate, it is subject to change and uncertainty based on future events.

- Although the deadlines for filing prepetition claims has expired, the possibility remains that a prepetition Creditor may attempt to file and recover on an Unsecured Claim, which, if Allowed, could change the ability to fund the Plan.

- The chart is calculated on the basis of Claims that the Debtors believe may be Allowed.

| Category[1] | Class | Impaired | Estimated Amount | Estimated Recovery |
|---|---|---|---|---|
| Administrative Claims | Unclassified | no | $160,000[2] | 100% |
| Priority Claims | 1 | no | $193,000[3] | 100% |
| Secured Tax Claims | 2 | yes | $360,000 | 100% |
| Riot Energy Claims | 3 | yes | $21,000,000 | 0% |
| Unsecured Claims | 4 | yes | $70,000,000 | 0%-7% |

| Category[1] | Class | Impaired | Estimated Amount | Estimated Recovery |
|---|---|---|---|---|
| Subordinated Claims | 5 | yes | $0.00 | 0% |
| Equity Interests | 6 | yes | n/a | 0% |

1. Claims listed in this column refer to Allowed Claims.

2. This amount primarily consist of Cure Claims. This amount does not include Professional Claims, as sufficient retainers are in place to pay most or all of such claims. This amount also does not include an alleged Administrative Claim by the Debtor's landlord of approximately $150,000, which matter the Debtor continues to negotiate with the landlord, as well as the potential extension of the Debtor's current lease or a new short-term lease.

3. The Debtors believe that the final amount of Allowed Priority Claims will be considerably less. The Priority Claims consist almost entirely of prepetition unpaid employee claims. The Debtor, with permission of the Court, paid a large amount of these claims. The Debtor believes it has defenses to various of the other Priority Claims that have been asserted.

## B.    MEANS FOR IMPLEMENTATION OF THE PLAN

Sale of Assets and Assumption of Liabilities. Pursuant to the Bankruptcy Code, in exchange for the Purchase Price Amount (a credit bid of $4,300,000), Riot Energy will (i) acquire the Business Assets free and clear of all liens, claims and encumbrances unless otherwise provided in the Plan or in the Riot Energy APA and (ii) assume certain liabilities of the Debtors and the Estates all as more particularly set forth in the Riot Energy APA, including Priority Claims and Secured Tax Claims. All assumed liabilities shall remain subject to all of the Debtors, the Estates' and Riot Energy's defenses thereto.

Riot Energy Release Agreement with Debtors. On the Effective Date of the Plan, the Debtor Releasees and the Riot Energy Releasees will release each other from all claims, potential claims, suits, debts, liens, contracts, agreements, promises, liabilities, demands, rights, costs, expenses, actions, causes of action, and damages of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which any releasor has or may have, or which have been asserted or could be asserted in the future, that are based upon, arise out of, or in any way relate to the Debtors or their business or operations (including any claims under Chapter 5 of the Bankruptcy Code or similar State or Federal law). However, this will not apply to the D&O Actions and the D&O Insurance Actions, which will be transferred to the Creditor Trust.

Creditor Trust. The Plan creates a creditor trust for the benefit of Class 4 Creditors as follows:

Creation. On the Effective Date, and without need for further order, action, or document, the "ZP Creditor Trust" (the "Creditor Trust") will be created. The Creditor Trust will be a grantor trust under federal law and shall not have any liability to pay any income tax.

Trustee. The Creditor Trust will be solely and fully administered by the Creditor Trust Trustee. The Plan does not yet name the Creditor Trust Trustee. The Debtor has

sought input from various of the major creditors as to who their preference to be the Creditor Trust Trustee would be, but the Debtor has not heard back from these creditors yet on this issue. The Debtor would prefer that the major creditors collectively pick the trustee, as opposed to the Debtor designating the trustee, which the Debtor will ultimately do if creditors fail to so designate. The Trustee will have the fiduciary duties of a trustee to the Creditor Trust. Among other rights, duties, and powers, the Creditor Trust Trustee will have the right, standing, and ability to liquidate and monetize all Creditor Trust Assets. The Creditor Trust Trustee will have the same liabilities to the Creditor Trust and its beneficiaries as would a Chapter 7 trustee under the Bankruptcy Code and will have the same protections afforded such a trustee.

Compensation. The Creditor Trust Trustee will be entitled to compensation of up to $400 per hour, and the reimbursement of reasonable expenses.

Vesting of Assets. On and after the Effective Date, the Creditor Trust will be vested with the following assets, free and clear of all liens, claims, interests, and encumbrances (the "Creditor Trust Assets"):

> (i)     the Causes of Action (including the Widex Actions, D&O Actions, Avoidance Actions, and D&O Insurance Actions); and

> (ii)    $50,000.00 in cash from the Debtors that is otherwise Riot Energy's cash collateral (the "Seed Money").

The largest of the Causes of Action are the Widex Actions and the D&O Actions. Regarding the Widex Actions, as discussed above and below, after the Petition Date Widex breached its contract with the Debtor, cancelled its orders, and violated the automatic stay. The Debtor believes that the damages are in the millions. One of the results of these actions was that the Debtor was forced to shut down its production and lay off most of its employees. The Debtor then did not produce any product or generate revenue for a period of two months, losing more than $1 million in revenue, and, when the Debtor resumed manufacturing operations, it incurred large additional costs to do so and to rehire employees. This is in addition to more than $2.8 million that Widex owed from prior to the Petition Date, by not paying the Debtor sufficient amounts for products that it had purchased (while Widex was granted a volume discount, it did not meet the volume threshold, meaning that it was required to pay more to the Debtor), and at least $770,000 in parts that Widex failed to pay for.

Shortly after the foregoing breaches, the Debtor filed a complaint against Widex with the Bankruptcy Court, which initiated Adversary Proceeding No. 20-04026. Widex moved the Bankruptcy Court to compel arbitration of the dispute in Denmark, which motion the Debtor opposed. The Bankruptcy Court held a hearing on the motion to compel arbitration on August 24, 2020, and has yet to rule as of this filing. Suffice it to say that the value of the Widex Actions will decline if the Creditor Trustee is forced to arbitrate the claims in Denmark, if for no other reason than the added costs and burdens of arbitration, especially if the Covid pandemic continues to make international travel impossible.

With respect to the D&O Actions, the Debtor takes no position as to whether these claims have any merit or value. Several of the largest creditors and equity interest holders have informed the Debtor of their belief that the prior management and board of the Debtor, from before the Petition Date, may have committed actionable breaches of fiduciary duty, either in the form of raising funds, managing the Debtor's operations, or otherwise. There is D&O insurance in place, with tail coverage, and the Debtor or individual board members have placed the carrier on notice; hence the D&O Insurance Actions.

Beneficiaries. The beneficiaries of the Creditor Trust will be holders of Allowed Class 4 Claims, pro-rata.

Governance. All governance and other matters regarding the Creditor Trust will be provided for in the ZP Creditor Trust Agreement (the "Creditor Trust Agreement"), to be filed as a Supplement to the Plan, which will also contain a deadline for the Creditor Trust to terminate, subject to requests to extend the same.

Committee. Up to the largest three (3) holders of Class 4 Claims, willing to serve, will be entitled to sit on the ZP Creditor Trust Committee, and will have all rights provided for in the Creditor Trust Agreement, including to manage and remove the Creditor Trust Trustee.

Distributions. The Creditor Trust will make distributions, from time to time, pro-rata to holders of Allowed Class 4 Claims, from the Creditor Trust Assets, to be determined by the Creditor Trust Trustee and as provided for in the Creditor Trust Agreement.

Vesting of Assets. All property and assets of the Estates transferred to and vested in Riot Energy and/or the Creditor Trust under the Plan shall be transferred free and clear of all liens, claims, interests, and encumbrances, except only for those liens, claims, interests, and encumbrances expressly and explicitly preserved or created under the Plan.

**C.   DISCHARGE**

If the Plan is confirmed by the Bankruptcy Court, the Debtors will not receive a discharge under Chapter 11 of the Bankruptcy Code.

**THE PLAN CONTAINS PERMANENT INJUNCTIONS THAT MAY PREVENT YOU FROM SEEKING TO ASSERT OR COLLECT YOUR CLAIM EXCEPT THROUGH THE PLAN. YOUR RIGHTS MAY BE SEVERELY IMPACTED. STUDY THE PLAN CLOSELY AND CONSIDER CONSULTING WITH LEGAL COUNSEL REGARDING THE PLAN AND YOUR RIGHTS AND LIMITATIONS THEREUNDER.**

The Plan contains injunctions and exculpation provisions which the Debtors believe are standard and necessary for the confirmation of the Plan and the establishment of the Creditor Trust. These injunctions and exculpation provisions do not impact any personal, non-derivative Claim that a Creditor has against a non-Debtor party. No Claim that the Estate may have, or that

Creditors may derivatively assert, arising from gross negligence or intentional wrongdoing is enjoined or prohibited.

**D.**     **CLASS TREATMENT UNDER THE PLAN**

Treatment of a Claim under the Plan depends on the Class under the Plan that the Claim is classified under, and whether the Claim is classified. What follows below is a summary of the treatments under the Plan of the various Classes created under the Plan. The following is a summary only, and the Plan controls in all events. Thus, close reference to the Plan is required to fully understand any Class's treatment under the Plan.

**1.**     **Unclassified Claims**

Administrative Claim Applications and Deadline. Holders of Administrative Claims, including Professional Claims, other than: (a) Allowed Administrative Claims as of the Effective Date; (b) Administrative Claims that represent liabilities incurred on or after the Petition Date, but prior to the Effective Date, in the ordinary course of the Debtors' business which may be paid in the ordinary course of the Debtors' business without order of the Bankruptcy Court; and (c) Administrative Claims that constitute fees or charges assessed against the Estate under Chapter 123, Title 28, United States Code, must by no later than the Administrative Claims Bar Date: (x) file an application with the Bankruptcy Court for allowance of the Administrative Claim; and (y) serve a copy of such application on counsel for the Debtors, Riot Energy, the United States Trustee, and all other parties otherwise entitled to notice thereof. Failure to file and serve such application by the Administrative Claims Bar Date shall result in the Administrative Claim being forever barred and discharged as against the Debtors, their Estates, and Riot Energy, and the property of any of the foregoing including property transferred pursuant to the Plan. Except as specifically provided in the Plan, nothing in the Plan alters the law applicable to, and governing, the allowance of Administrative Claims (including Professional Claims) under the Bankruptcy Code.

Treatment of Allowed Administrative Claims. Except with respect to Administrative Tax Claims (see Section 3.4 of the Plan), and unless previously paid, each holder of an Allowed Administrative Claim, including a Professional Claim, shall be paid in full satisfaction, release and discharge of, and in exchange for such Allowed Administrative Claim, the amount of such Allowed Administrative Claim by Riot Energy, in cash, and without interest, attorney's fees (except as Allowed by the Bankruptcy Court), or costs, no later than ten (10) Business Days after the Effective Date, provided that any Allowed Administrative Expense that is incurred by the Debtors after the Petition Date in the ordinary course of business operations and that is unpaid as of the Effective Date shall be assumed and paid by Riot Energy in accordance with the business terms that exist between the Debtor and such claimant and as set forth in the Riot Energy APA.

Treatment of Professional Claims. Professional Claims become Allowed the same as Administrative Claims (Section 3.1 of the Plan), and are treated the same as Administrative Claims (Section 3.2 of the Plan), except that: (i) a Professional Claim that has been previously Allowed on a final (not interim) basis by Final Order of the Bankruptcy Court is not subject to the requirement for filing an application as provided for in Section 3.1 of the Plan; (ii) a Professional Claim that has been Allowed on an interim basis (not final) in whole or in part shall, with respect to being Allowed on a final basis, be subject to the filing of an application for its

allowance as provided for in Section 3.1 of the Plan and shall be subject to such law, rules, and procedures as would be otherwise applicable to the same outside of the Plan; (iii) a Professional Claim that has been previously Allowed and paid on a final basis by Final Order of the Bankruptcy Court, but subject to disgorgement in the event of administrative insolvency, shall cease being subject to said disgorgement ten (10) days after the Administrative Claims Bar Date unless, upon motion and notice, the Bankruptcy Court extends such period; (iv) any interim payments on account of a Professional Claim shall be credited against the payment of the final Allowed amount of such Professional Claim; (v) any retainer provided on account of a Professional Claim may be credited and applied against the payment of the final Allowed amount of such Professional Claim once such Professional Claim is Allowed on a final basis; and (vi) any Professional Claim based on payment under section 328 of the Bankruptcy Code by commission or contingency shall be allowed and paid as provided for in the retention order of the Bankruptcy Code, without need for the filing of any application or other document with the Bankruptcy Court notwithstanding anything contained herein to the contrary.

Administrative Tax Claims. Administrative Tax Claims, and any liens securing the same, are not affected by, prejudiced by, discharged by, or treated by the Plan, and shall survive the Plan without need for any action on the part of the holder thereof. Administrative Tax Claims, and the liens securing the same, shall be paid when and as otherwise appropriate, together with such interest and other charges as otherwise appropriate, as soon as possible after the Effective Date or when the same otherwise become due and payable, by Riot Energy as provided in the Riot Energy APA. Notwithstanding anything contained in the Plan to the contrary, nothing in the Plan transfers or vests any property of the Debtors or the Estates free and clear of any lien securing an Administrative Tax Claim. All rights to contest any Administrative Tax Claim, including as may be appropriate under section 505 of the Bankruptcy Code, are preserved and vest in Riot Energy as of the Effective Date.

Section 505: For the avoidance of doubt, and without limiting the generality of any similar provision of the Plan, the Debtors and the Estates reserve all rights under section 505 of the Bankruptcy Code, as otherwise applicable, to contest any tax Claim and to seek appropriate determinations under said section 505 with respect thereto, and transfer the same hereunder to Riot Energy.

## 2. **Classified Claims**

### **Class 1: Allowed Priority Claims**.

In full and final satisfaction, release, and exchange of each Priority Claim, each Priority Claim, to the extent Allowed, shall be paid by Riot Energy, but only to the extent Allowed, over a period of one (1) year, without interest, through twelve (12) equal consecutive monthly payments, commencing on June 1, 2021. Class 1 is not impaired under the Plan.

The Debtor urges holders of Priority Claims, mostly consisting of former employees, to vote for the Plan, because, otherwise, there is a material risk that the Debtor will not be able to pay all such claims in cash up-front, which could lead to a conversion of the Bankruptcy Case to Chapter 7, in which case the Debtor believes that Priority Claims would receive nothing.

### **Class 2: Secured Tax Claims**.

Any Secured Tax Claim, to the extent allowed, shall be assumed and paid by Riot Energy, as set forth in the Riot Energy APA, over a period of three (3) years, with interest at the applicable non-bankruptcy, non-default rate, through thirty-six (36) equal consecutive monthly payments of principal and interest, commencing on June 1, 2021. Notwithstanding anything contained to the contrary in this Plan, each holder of a Secured Tax Claim shall retain all liens and security interests securing the same as against Riot Energy with respect to the Business Assets, but not as against any property transferred to the Creditor Trust under this Plan, and subject to all defenses thereto. Class 2 is impaired under the Plan.

### Class 3: Riot Energy Claims.

The Riot Energy Claims shall be Allowed in the amount of $21,187,503.00. On the Effective Date the Purchase Price Amount shall be exchanged for the Business Assets in accordance with the terms of the Riot Energy APA. The Riot Energy Released Amount shall be satisfied and released in accordance with the Riot Energy Release Agreement and Riot Energy shall receive nothing further on account of the Riot Energy Claims. Class 3 is impaired under the Plan.

### Class 4: Unsecured Claims.

Nothing in the Plan Allows any Unsecured Claim. In full and final satisfaction, release, and exchange of each Unsecured Claim, each Unsecured Claim, to the extent Allowed, shall receive a pro-rata share of any distributions or payments made by the Creditor Trust pursuant to the provisions of section 5.3 of the Plan. Class 4 is impaired under the Plan.

### Class 5: Subordinated Claims.

Nothing in the Plan Allows any Subordinated Claim. To extent of any such Claim, such Allowed Subordinated Claim shall receive and retain nothing under the Plan. Class 5 is deemed to reject the Plan.

### Class 6: Existing Equity Interests.

Holders of any Equity Interest in the Debtors prior to the Effective Date shall receive or retain nothing under the Plan, and all such Equity Interests shall be cancelled. Class 6 is deemed to reject the Plan.

### E.    ASSUMPTION OF EXECUTORY CONTRACTS

Any Executory Contract not listed on Schedule "A" to the Plan shall be deemed rejected as of the Effective Date unless such Executory Contract was previously rejected by operation of law or pursuant to an Order of this Court in which case such Executory Contract shall be deemed rejected effective as of the date specified in any prior order or as provided by law. Any Executory Contract listed on Schedule "A" hereto shall be assumed and assigned as of the Effective Date to Riot Energy as part of the Business Assets, with any resulting Cure Claim to be paid for such assumption set and judicially determined at the amount listed on Schedule "A". Any such Cure Claim shall be assumed and paid by Riot Energy. Any Rejection Damages Claim shall be a Class 4 Claim and treated as such under the Plan.

F.    **PRESERVATION AND TRANSFER OF CAUSES OF ACTION**

The Plan preserves all Causes of Action, including the Widex Actions, the D&O Actions, the Avoidance Actions, and potential claims and causes of action against Oticon (as discussed in the Plan).  Under the Plan, these assets are transferred either to the Creditor Trust or to Riot Energy, subject to all defenses of any defendant thereto.

## ARTICLE IV.
## VOTING PROCEDURES AND REQUIREMENTS

A.    **VOTING DEADLINE**

Each Creditor holding a Claim which entitles the Creditor to vote on the Plan has been provided a Ballot along with this Disclosure Statement.  If a Creditor holds Claims in more than one Class entitled to vote under the Plan, such Creditor has been provided a separate Ballot for each such Class.  The Ballot is to be used by the Creditor to accept or reject the Plan.

To ensure that a Ballot is deemed timely and considered by the Balloting Agent, which shall be the Debtors' attorneys, Munsch Hardt Kopf & Harr, P.C., c/o Davor Rukavina, a Creditor must: (a) carefully review the Ballot and the instructions set forth thereon; (b) provide all of the information requested on the Ballot; (c) sign the Ballot; and (d) return the completed and signed Ballot to the Balloting Agent by the Voting Deadline.  By order of the Bankruptcy Court, the "Voting Deadline" is 5:00 p.m. (Central Time), on _____, 2021.  Therefore, in order for a Ballot to be counted for voting purposes and any applicable election, the completed and signed Ballot must be received at the address specified below by no later than the Voting Deadline:

**DEADLINE**:  Must Be **Received** By 5:00 p.m., Central Time, on _____, 2021

**Addressed To:**
Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Facsimile: (214) 978-5359

B.    **CREDITORS SOLICITED TO VOTE**

Each Creditor holding a Claim in a Class which is impaired under the Plan is being solicited to vote on the Plan, except Classes 5 and 6, which are deemed to reject the Plan.  As to any Claim for which a proof of claim was filed and as to which an objection has been lodged, however, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to the extent that the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount which the Bankruptcy Court deems proper for the purpose of voting on the Plan.  Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court for determination of confirmation of the Plan.  In addition, a Creditor's vote may be disregarded if the Bankruptcy Court determines that the

Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.   DEFINITION OF IMPAIRMENT

Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is impaired under a plan <u>unless</u>, with respect to each Claim of such Class, the Plan does one of the following:

1.   leaves unaltered the legal, equitable, and contractual rights to which such Claim entitles the holder of such Claim; or

2.   notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:

   (a)   cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

   (b)   reinstates the maturity of such Claim as it existed before the default;

   (c)   compensates the holder of such Claim for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

   (d)   does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder of such Claim.

## D.   CLASSES IMPAIRED UNDER THE PLAN

Classes: 2, 3, and 4 are impaired and entitled to vote on the Plan.  Class 1 is not impaired. Classes 5 and 6 do not receive any property under the Plan and are therefore deemed to reject the Plan.  Ballots for the acceptance or rejection of the Plan shall be mailed to holders of Claims in such impaired Classes only and to holders of such Claims within such Classes only.

## E.   VOTE REQUIRED FOR CLASS ACCEPTANCE

Pursuant to the Bankruptcy Code, a Class of Claims under the Plan that is impaired shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims within such Class who are entitled to vote and who actually vote using a properly completed and signed Ballot which is returned to the Balloting Agent by no later than the Voting Deadline.

Under the Bankruptcy Code, the votes of certain Creditors or Equity Interest holders may be disregarded if their acceptance or rejection of the Plan was not in good faith, or was not solicited or procured in good faith or in accordance with the Bankruptcy Code.  The Debtors reserve all their rights to seek one or more of such designations in the event that the same becomes applicable.

## ARTICLE V.
## CONFIRMATION OF THE PLAN

### A.   OVERVIEW OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor-in-possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest. The present Bankruptcy Case commenced with the filing of voluntary Chapter 11 petitions by the Debtors on the Petition Date. However, Chapter 11 also contemplates a liquidation as opposed to a reorganization, and Chapter 11 permits creditors and others to file a proposed plan in certain instances.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Thus, the Estates exist as the bankruptcy estates of the Debtors and their property (and liabilities). Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee. In the present Bankruptcy Case, the Debtors have remained in possession of their property and have continued to operate their businesses as debtors-in-possession.

The filing of a Chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the Effective Date of a confirmed plan of reorganization.

### B.   CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) provides that any party in interest may object to confirmation of the Plan. The Confirmation Hearing has been scheduled for _____, 2021 at _____.m. in the United States Bankruptcy Court, Courtroom of The Honorable Edward Lee Morris, U. S. Courthouse, 501 W. 10th Street, Second Floor, Fort Worth, Texas 76102.

Any objection to confirmation of the Plan must made in writing, and such written objection must be filed with the Bankruptcy Court by no later than **5:00 p.m. Central Time on _____, 2021**:

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND SHALL BE DEEMED WAIVED.**

### C.   MODIFICATION OF THE PLAN

Section 1127 of the Bankruptcy Code generally permits the debtor to modify the Plan before or after the Confirmation Hearing, assuming that certain requirements are satisfied. The

Debtors reserve their right to submit modifications of the Plan, as may be deemed advisable by the Debtors, and under the provisions of section 1127 of the Bankruptcy Code.

## D. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements of section 1129 of the Bankruptcy Code have been satisfied, and in the event that they have been and all other conditions to confirmation set forth in the Plan itself have been met, the Bankruptcy Court will enter an order confirming the Plan. The requirements of section 1129 generally are as follows:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Debtors comply with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and not by any means forbidden by law.

4. Any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5. The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation of such insider.

6. Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval. The Debtors do not believe this requirement is applicable to the Bankruptcy Case.

7. With respect to each impaired Class: (a) each holder in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date; or (b) if section 1111(b)(2) of the Bankruptcy Code applies to the Claims of such Class, each holder in such Class will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the Estate's interests in the property that secures such Claims. This means that, if a Creditor rejects the Plan, the Plan must provide the Creditor with at least what it would receive in a hypothetical Chapter 7 liquidation of the Debtors.

8.      With respect to each Class: (a) such Class has accepted the Plan; or (b) such Class is not impaired under the Plan.  If an impaired Class has rejected the Plan, then the Plan may still be confirmed on cramdown with respect to that Class, as discussed below.

9.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides: (a) that with respect to a Claim of a kind specified in section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the Effective Date of the Plan, the holder of such Claim will receive on account of such Claim cash equal to the Allowed amount of such Claim; (b) that with respect to a Class of Claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred cash payment of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim, or (ii) if such Class has not accepted the Plan, cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and (c) with respect to a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such Claim will receive on account of such Claim deferred cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

10.     If a Class of Claims is impaired under the Plan, at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

12.     All fees payable under Section 1930 of Title 28 (United States Code), as determined by the Bankruptcy Court, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

13.     The Plan provides for the continuation after its Effective Date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.  The Debtors do not believe this requirement is applicable to the Bankruptcy Case.

There are various other provisions governing the confirmation of the Plan that, on their face, the Debtors do not believe are applicable (and are related instead to the confirmation of an individual person's Chapter 11 plan).

## E.      CRAMDOWN

The Bankruptcy Court may confirm the Plan at the request of Debtors if: (a) all of the requirements of section 1129(a) of the Bankruptcy Code are met, with the exception of section 1129(a)(8); (b) at least one Class of Claims that is impaired under the Plan has accepted the Plan (excluding the votes of Insiders), if a Class of Claims is impaired; and (c) as to each impaired

Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable." This is referred to as cramdown.

A Chapter 11 plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the classification of claims under a plan complies with the Bankruptcy Code and no particular class will receive more than it is legally entitled to receive for its claims. The Debtors believe that the classifications established under the Plan are proper and that no Class under the Plan is receiving more than it is legally entitled to receive. "Fair and equitable," on the other hand, has different meanings for Secured and Unsecured Claims.

With respect to a Class of Secured Claims that rejects the Plan, to be "fair and equitable" the Plan must, among other things, either: (a) provide that the holders of such Secured Claims retain their liens securing such Claims, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims, and that each holder of a Secured Claim in such Class receive on account of such Claim deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the Estates' interest in such property; or (b) provide for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such Secured Claims, free and clear of such liens, with such liens to attaching to the proceeds of such sale, and the treatment of such liens on such proceeds in accordance with the Bankruptcy Code; or (c) provide for the realization by the holders of such Secured Claims of the indubitable equivalent of such Claims. The Debtors believe that the Plan is fair and equitable to each Class of Secured Claims under the Plan and that, in fact, all such Classes are unimpaired.

With respect to a Class of Unsecured Claims which rejects the Plan, to be "fair and equitable" the Plan must, among other things, either: (a) provide that each holder of an Unsecured Claim in such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (b) not allow the holder of any Claim that is junior to the Unsecured Claims of such Class to receive or retain any property under the Plan on account of such junior Claim; that is, not permit any holder of any equity interest in the Debtors to retain anything under the Plan on account of such interest. This is called the Absolute Priority Rule and it protects Unsecured Creditors by ensuring that equity owners do not retain their equity interests without payment in full to Unsecured Creditors. There is an exception to the Absolute Priority Rule, however, called the New Value exception or corollary, under which, providing that all requirements are met, owners of equity in a debtor may obtain new equity in the reorganized debtor if they pay sufficient new value for that equity.

In the event that at least one Class of Claims is impaired under the Plan, and if at least one impaired Class of Claims under the Plan accepts the Plan and one or more Classes of impaired Claims rejects the Plan, the Debtors will seek confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code. In such event, the Bankruptcy Court will determine, at the Confirmation Hearing, whether the Plan is fair and equitable and whether it does or does not discriminate unfairly against any rejecting impaired Class of Claims.

## F.   EFFECTIVE DATE OF THE PLAN

The Plan shall not become effective until the following conditions shall have been satisfied: (i) the Confirmation Order shall have been entered, in form and substance acceptable to

the Debtors and Riot Energy; (ii) on the fifteenth (15th) day after the Confirmation Date, no notice of appeal of the Confirmation Order shall have been filed or, if filed, no order staying the Confirmation Order shall have been entered by such date; (iii) the Debtors shall have satisfied all conditions to closing set forth in the Riot Energy APA; (iv) the Creditor Trust Trustee shall have negotiated and executed the Creditor Trust Agreement; (v) all other specific condition precedents contained in the Plan shall have been satisfied; and (vi) a notice of the Effective Date shall have been filed by the Debtor in the Bankruptcy Case. Pursuant to the provisions of the Plan, the Debtors will transmit notice of the effectiveness of the Plan if the Bankruptcy Court confirms the Plan and all conditions precedent to the Plan's effectiveness are satisfied. This notice will also specify various other Plan deadlines that are triggered by the Effective Date of the Plan.

## ARTICLE VI.
## BACKGROUND INFORMATION

### A. THE DEBTORS

ZPower, LLC (the "Debtor"), in existence from more than twenty years, develops, manufactures, and sells cutting-edge batteries, including high density microbatteries for use in hearing aids and other critical applications. The Debtor's silver-zinc proprietary batteries, innovated from NASA-derived Apollo technology, are market leaders in energy density, safety, and reliability. The Debtor manufactures its products at its leased manufacturing facilities in Camarillo, California. Holding more than 75 patents, together with dozens of trademarks and an extensive amount of trade secrets, all developed over the years at an investment of over $200 million, the Debtor is also developing the next generation of printable batteries for the IOT (Internet Of Things) and medical wearables markets, which the Debtor believes will soon dominate the marketplace, with the Debtor being critically and strategically poised to lead and to exploit this massive opportunity. This next generation of development, however, will take millions of dollars of additional funding before market-ready batteries are introduced; funds which the Debtor does not have, which the Debtor does not otherwise have access to, and which most of the Debtor's current investors have informed the Debtor they will not fund or advance.

The Debtor therefore finds itself at a crossroads where its current line of products is diminishing over the next few years, due to the natural life cycle of those products, while the revenue from that line is insufficient to bring to market the next generation of batteries, while the Debtor lacks the funds and investments to otherwise bring to market that next generation of batteries. In sum, the Debtor needs millions of dollars of additional funding in order to have any prospect of future success; funding that, to-date, only Riot Energy has indicated any desire and means to provide.

### B. EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING

Before the Petition Date, MidCap Financial Trust ("MidCap") was the Debtor's senior, secured lender, with perfected security interests against substantially all of the Debtor's assets, securing a claim in excess of $22 million. MidCap, a board observer with knowledge of the Debtor's market-potential and upside, unexpectedly declared a default, despite the Debtor being current in all respects. MidCap then swept the Debtor's funds without warning and refused to agree to any use of its alleged cash collateral. While the Debtors believe these actions to have been wrongful, and while the Debtors would ultimately deal with these issues and reserve all rights with respect to the same, these actions forced the Debtor to reconsider its balance sheet

and its long-term prospects and strategy in light, not only of its then-existing market position, but in light of the future capital that will be needed to bring the printable batteries to the market.

As MidCap cut off the Debtor, the Debtor engaged in many negotiations with its key constituents about a potential workout or other restructuring, not only to remove MidCap, but to clean up the balance sheet and provide necessary working and research and development capital. However, this was mid-March, when investors were seeing daily 10% drops in their portfolios. Suffice it to say, the key investors were not interested in investing any further funds in the Debtor, even if they otherwise had a belief in the Debtor's future, which most of them did not.

The Debtors therefore filed these Bankruptcy Cases to preserve and enhance their assets and business value for the benefit of all stakeholders while they sought the best mechanism available to maximize value for all.

## C. FIRST DAY PLEADINGS AND HEARING

Upon the filing of the Bankruptcy Case, it was critical to the Debtors that they smoothly transition into bankruptcy and continue to operate their business in Chapter 11 in compliance with all of the requirements thereof. Accordingly, on the Petition Date, the Debtors filed multiple so-called "first day" pleadings to ensure this purpose. These first day pleadings included:

1. Motion for Joint Administration of the Debtors Cases [Docket No. 4];

2. Motion for Authority to Pay Prepetition Wages [Docket No. 5];

3. Motion for Authority to Pay Prepetition Critical Vendors [Docket No. 6] (the "Critical Vendors Motion");

4. Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments [Docket No. 7)];

5. Motion for Approval of Interim and Final Postpetition Financing on a Secured Superpriority Basis [Docket No. 7] (the "DIP Motion"); and

6. Motion to Limit Notice and Establish Notice Procedures [Dkt. No. 14].

The Bankruptcy Court approved these first day motions, with two exceptions. First, the Debtors ultimately withdrew the Critical Vendors Motion. Second, the Court initially granted the DIP Motion on an interim basis, but after a protracted fight with MidCap over the relief requested in the DIP Motion, the Court denied the DIP Motion on a final basis. The circumstances of this particular dispute are discussed in more detail below.

## D. RETENTION OF MUNSCH HARDT

On March 24, 2020, the Debtors filed their application to employ Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") as their general bankruptcy counsel. By order entered April 15, 2020, the Bankruptcy Court authorized the Debtors to retain Munsch Hardt on a final basis,

effective as of the Petition Date, and for the compensation of Munsch Hardt pursuant to interim and final fee applications to be filed by Munsch Hardt [Docket No. 88].

## E. RETENTION OF OTHER PROFESSIONALS

On March 20, 2020, the Debtors filed an application to employ Lain, Faulkner & Co. as their financial advisors. The Bankruptcy Court entered an order approving the Debtors' retention of Lain Faulkner on April 15, 2020 [Docket NO. 87]. Lain Faulkner has assisted the Debtor with, among other things, preparing financial projections and completing required financial disclosures required under the Bankruptcy Code and Rules.

On April 3, 2020, the Debtor filed their application to employ Fiscal Partners, LLC as their outside controller. The Bankruptcy Court entered an order approving the retention of Fiscal Partners on April 28, 2020 [Docket No. 146]. It was necessary for the Debtor to retain fiscal partners promptly because their prior controller elected not to continue his relationship with the Debtors upon their filing for bankruptcy protection. Fiscal Partners has assisted the Debtors with maintaining their books and records since then.

In light of their significant intellectual property holdings, on May 13, 2020, the Debtors filed an application to Employ Honigman LLP as their special intellectual property counsel. The Bankruptcy Court entered an order approving the Debtors' retention of Honigman on June 5, 2020 [Docket No. 211]. Among other things, Honigman has assisted the Debtor with maintaining the ongoing validity and enforceability of their intellectual property portfolio by ensuring that all necessary documentation and fees are submitted to the appropriate domestic and international authorities on a timely basis.

## F. THE DEBTORS' OPERATIONS IN BANKRUPTCY

At the time the Debtors filed for bankruptcy protection, Widex A/S and/or Widex USA, Inc. (collectively, "Widex") was the Debtors' largest customer, representing about 40% of the Debtor's revenue. Widex is a Danish hearing aid manufacturer that purchased microbatteries from the Debtor to power its products. Unfortunately, shortly after the Petition Date, Widex sent a blast email to all of its United States customers informing the marketplace that it would no longer sell hearing aids with ZPower batteries, citing the Bankruptcy Case as the reason for its decision. The Debtors believe this action violated the Bankruptcy Code's automatic stay and constituted a breach of contract, so the Debtor promptly asserted the Widex Actions against Widex in an adversary proceeding (*i.e.* lawsuit) filed in the Bankruptcy Court.

While that lawsuit may provide some relief in the future, the immediate effect of Widex's actions was devastating. The Debtors had no choice but to cease operations and lay off most of their workforce. The domino effect of this catastrophe ultimately contributed to the Bankruptcy Court denying the DIP Motion on a final basis, leaving the Debtors without adequate postpetition financing.

After the disruption from Widex, the Debtor was able to obtain new purchase orders at increased prices from other customers, most notably Oticon, who now became the Debtor's largest customer. These customers had a continuing need for the Debtor's products and, unlike Widex, did not choose to slander the Debtor and its business in order to get customers to switch over to other Widex products using other batteries. After months of negotiations, Oticon and

others have placed orders with the Debtor for its products, which should enable the Debtor to continue operating and manufacturing products into late 2021.

### G.     TRANSFER OF MIDCAP DEBT TO RIOT ENERGY

On May 21, 2020, the DIP Lender, now Riot Energy, closed the Purchase of MidCap's claims, debt, liens, security interests, and all rights against the Debtor and in the Bankruptcy Case. Before that transaction closed, MidCap generally opposed the Debtors' attempts to reorganize. For example, as previously mentioned, MidCap opposed the Debtor's attempts to obtain postpetition financing from the DIP Lender, and the Court ultimately sustained MidCap's objections and denied the DIP Motion on a final basis. The Debtor did not have authority to use MidCap's cash collateral, which was exacerbated by the fact that Widex stopped placing orders. With the DIP Lender's consent, however, as the new owner of MidCap's position, the Debtor resumed production at its Camarillo, CA facility. Since then, Riot Energy has been generally supportive of the Debtor.

Riot Energy is directly or indirectly owned and controlled by the following two principal persons: Marilyn Hanna and Leon Kaplan. Both of these individuals, who have been investors in the Debtor from early on, also have sizable debt and equity positions against the Debtor prepetition separate and apart from the MidCap debt that Riot Energy owns.

### H.     MANAGEMENT AND THE DEBTOR'S BOARD

The board of directors (managers) of the Debtor retained Glynne Townsend, who has been in the battery business for years and has run other battery businesses and divisions in the past, in late 2019 as the Chief Executive Officer in order to attempt to turn around the Debtor's failing business, and after various prior officers either resigned or were terminated. As of the Petition Date, Mr. Townsend was also named the Debtor's Chief Restructuring Officer.

As of the Petition Date, the Debtor had a 6-person board of directors (managers). Shortly after the Petition Date, Arthur N. Budge, Jr., and Steven R. Shane, resigned from the board. As the Debtor understood it, these gentlemen resigned in order to be free to attempt to raise new funds and loans to reinvest in a reorganized debtor. On January 8, 2021, Sheila M. Chesney and James R. Stolarski also resigned from the board for unspecified reasons. That leaves Glynne Townsend and Roberta Smith as the remaining directors of the Debtor.

### ARTICLE VII.
### PLAN ALTERNATIVES

There are two basic alternatives to the Plan. First, reorganization of the Debtors is an alternative. However, the Debtors do not believe this to be a realistic possibility. It would require someone other than the Debtors to propose a Chapter 11 plan, and it would require Riot Energy to be paid upwards of $22 million, while funding millions of dollars in future research and development and others costs. The Debtor has spent months discussing a potential plan with key constituents pursuant to which, through a rights offering, the Debtor could be recapitalized. None of these key constituents indicated any desire to participate in a rights offering or to invest any additional funds into the Debtor. Moreover, a very large portion of the Debtors' business is due to the personal participation, reputation, and contacts of its existing management and staff. A plan that seeks to reorganize the Debtors without their active participation and support is

highly unlikely to succeed, and neither the Debtors nor any creditor can force their continuing participation and support.

Indeed, the Debtor intentionally allowed its exclusive period to file a Chapter 11 plan to expire approximately on approximately September 14, 2020, partially in order to permit any other constituent who had a meaningful idea as to how to reorganize or liquidate the Debtor to propose its own plan. No one, however, has filed any plan and the present Plan is the only one that has been proposed.

Attached hereto as Exhibit __ are the Debtor's present business projections. The Debtor believes that those projections demonstrate that it does not have enough of a going concern value to pay even the senior secured claims of Riot Energy, much less any junior creditors. Those projections also demonstrate that the Debtor, without new funding, will not be able to maintain its business for long. In short, and unless someone is willing to propose a plan of reorganization that they are also willing to fund, the Debtor does not believe that a reorganization in Chapter 11 is feasible or that it is in the best interests of those creditors who do not want to invest new funds into the Debtor.

Second, the Debtors could be liquidated under Chapter 7 of the Bankruptcy Code. But liquidation under Chapter 7 would differ from liquidation under the Plan in four material respects. For one thing, a Chapter 7 Trustee would be appointed, and he would retain counsel. This would result in additional administrative expenses that must be paid before general unsecured creditors can be paid. For another, Riot Energy would likely not allow $50,000 of its cash collateral to be used as Seed Money for the benefit of other creditors. Riot Energy would claim a lien against various Causes of Action that are being conveyed to the Creditor Trust, leaving little to no value for other creditors. And, upwards of $20 million of Riot Energy's unsecured claim would be added to the pot of unsecured claims which would have to share in any recovery pro rata.

The Debtor has not prepared a Chapter 7 liquidation analysis, principally because the Debtor does not want to assign a potential value to the Causes of Action because: (i) a detailed analysis of that value has not been undertaken; and (ii) the Debtor does not want future potential defendants to be able to use any such information to potentially minimize their liability of prejudice the potential litigation claims of the Creditor Trust. Since the Plans call for a liquidation anyway, the Debtor does not believe that a liquidation analysis is required or is necessarily helpful. First, there is no question that the value of the Business Assets being transferred to Riot Energy is much less than the more than $20 million size of the underlying secured claim. Thus, other unsecured creditors cannot share in the value of the Business Assets. Second, under the Plan, the Debtor contributes $50,000.00 as Seed Money to the Creditor Trust, and Riot Energy effectively releases its liens from the Causes of Action, such that Unsecured Creditors are able to share in that value. Under Chapter 7, Riot Energy would have the lien on prepetition Causes of Action to almost $20 million, and on postpetition Causes of Action of more than $1 million, thus making it unlikely that Unsecured Creditors would recover from most of the Causes of Action. The exception to this would be Avoidance Actions, which all Unsecured Creditors would share in, but then so would Riot Energy as well, as it will have an unsecured deficiency claim in Chapter 7 of almost $20 million.

This is why a liquidation under the Plan, as opposed to in Chapter 7, is, in the Debtor's judgment, in the best interests of Unsecured Creditors.

# ARTICLE VIII.
# RISK FACTORS

**A.     ESTIMATED RECOVERY RISKS**

The principal risk associated with the Plan, particularly for general unsecured creditors in Class 4, is that the value of the Causes of Action being transferred to the Creditor Trust is unknown.  It will take time and cost money to prosecute those claims, and, as is always the case with litigation, it is possible the risk will outweigh the reward and that the Causes of Action will have zero value.  Nevertheless, the Creditor Trust will exist and will still have certain rights to certain litigation recoveries, which is still a better outcome than a possible conversion to Chapter 7.

**B.     BANKRUPTCY RISKS**

Insufficient Acceptances.  For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan.  With regard to such impaired voting Classes, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted.  Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.  The Debtors reserve the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan.  However, there can be no assurance that any impaired Class of Claims under the Plan will accept the Plan or that the Debtors would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

Confirmation Risks.  The following specific risks exist with respect to confirmation of the Plan:

(a)     Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.

(b)     Since the Debtors may be seeking to obtain approval of the Plan over the rejection of one or more impaired Classes, the cramdown process could delay confirmation or prevent confirmation if the Bankruptcy Court finds that the cramdown standards have not been met.

(c)     The Bankruptcy Court may take the confirmation of the Plan under advisement, meaning that the Bankruptcy Court may take weeks or months to determine whether to confirm the Plan.

Conditions Precedent.  Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur.  The Debtors, however, will work diligently with all parties in interest to ensure that all conditions precedent are satisfied.

## ARTICLE IX.
## CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN

The Debtor believes that holders of equity interests in the Debtor may face cancellation of debt income in the total amount of $84,784,000.00 on account of recourse debt being cancelled pursuant to the Internal Revenue Code and related regulations, which would constitute ordinary income. Normally, a discharge of debt in bankruptcy does not lead to cancellation of debt income and related tax, and the Debtor had originally been working towards a plan of reorganization that would have provided for a discharge. However, because the Debtor is an LLC, which is a disregarded entity for income tax purposes, that the Debtor may receive a discharge of its debt may not matter for purposes of cancellation of debt income and related tax, since all past and present tax attributes flowed to the Debtor's equity holders.

The Debtor and its advisors have spent months analyzing the potential income tax consequences and options for holders of equity interests in the Debtor, in order to seek to minimize potential adverse tax consequences. This is a large part of the delay in filing the Plan. Ultimately, the Debtor has determined, and has been advised, that there is nothing that can be done to avoid the risk of cancellation of debt income and related tax, since there is no doubt that the value of the Debtor's assets are far less than its debt, and that, whether through a reorganization, discharge, liquidation, Chapter 7, or sale, the risk of cancellation of debt income and related tax is there. That being said, the Plan represents, in the Debtor's judgment, the best means to enable affected stakeholders to potentially minimize adverse tax consequences resulting from the effective forgiveness of the Debtor's debt.

The Debtor believes that many, if not most or all, affected stakeholders will have losses, credits, or other tax attributes, including on account of potential claims they have against the Debtor, that they may be able to use to offset in whole or part the potential cancellation of debt income and related tax consequences of the Plan. Because each stakeholder's situation is necessarily different, the Debtor is unable to provide more guidance or analysis. All affected stakeholders are strongly encouraged to discuss the Plan and the Debtor with their tax advisors as soon as they can.

**THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS. NOTHING IN THIS DISCLOSURE STATEMENT OR IN THE PLAN IS MEANT TO PROVIDE ANY TAX ADVICE TO ANY CREDITOR OR INTEREST HOLDER.**

## ARTICLE X.
## CONCLUSION

The Debtors urge holders of Claims in impaired Classes to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their ballots so that they will be received on or before 5:00 p.m., Central Time, on _____, 2020.

**DATED: JANUARY 21, 2021.**

**MUNSCH HARDT KOPF & HARR, P.C.**

By: _/s/ Davor Rukavina_____
      Davor Rukavina, Esq.
      Texas Bar No. 2403078
      Julian P. Vasek, Esq.
      Texas Bar No. 24070790
      3800 Ross Tower
      500 N. Akard Street
      Dallas, Texas 75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 978-4375

**ATTORNEYS FOR THE
DEBTORS-IN-POSSESSION**